GEYSERS DEVELOPMENT
PARTNERSHIP,

        Plaintiff,

   v.

GEYSERS POWER COMPANY, LLC,

        Defendant.

Case No.  17-cv-06834-WHO

**ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 22

      Plaintiff Geysers Development Partnership ("GDP") brings this declaratory action against defendant Geysers Power Company, LLC ("Geysers Power") to clarify its right to grant an easement or other access on real property at The Geysers, the world's largest geothermal energy field, located in the Mayacamas Mountains in Sonoma County, California and Lake County, California ("the Property").  The Property is owned by GDP, but Geysers Power holds a 99-year lease allowing it to exclusively develop the infrastructure necessary to extract steam from the Property and use said steam to generate electricity.  GDP and Geysers Powers dispute which entity has the unfettered right to grant an easement or access to the Property for the purpose of installing and using power transmission lines and facilities to transmit electric power generated from steam extracted from land outside the Property.  The parties have filed cross-motions for summary judgment to resolve this question.  As discussed below, the plain language of the lease reserves the right to grant the easement at issue for GDP.  Accordingly, I GRANT summary judgment in GDP's favor.

## BACKGROUND

      In 1955, the owner of the Property (and GDP's predecessor-in-interest) Geysers Development Company ("GDC") entered into a 99-year Lease and Agreement ("Lease") with Geysers Power's predecessor-in-interest Magma Power Company ("Magma").  Declaration of Diego Sanchez-Elia ISO Plaintiff's Motion for Summary Judgment ("Sanchez-Elia Decl.") ¶¶ 2, 4 (Dkt. No. 20); *see* Ex. B to Compl. ("Lease," Dkt. No. 1-2).  The Lease has been amended on five

occasions in 1956, 1969, 1975, 1980 and 2000. *See* Ex. C-G to Compl. (Dkt. Nos. 1-3 to 1-7).

Only the original 1955 Lease and the 1956 amendment contain lease terms relevant to this action.

The 1955 Lease provides that:

> Lessor has granted, leased, let and demised and by these presents does grant, lease, let and demise to Lessee, its grantees, successors and assigns, upon and subject to the terms and conditions hereinafter set forth, the land and promises hereinafter described, with the sole and exclusive right to Lessee to drill for, produce, extract, take, remove and sell steam and steam power (and water without cost for Lessee's operations) from, and to store, utilize, process, convert, and otherwise treat with such steam and steam power upon, said land, during the term hereof. . .

Lease at 1-2.  It goes on to describe the parameters of Geysers Power's access to and use of the Property:

> . . .with the right of entry thereon at all times for said purposes, and to construct, use, maintain, erect, repair and replace thereon and to remove therefrom all roads, pipe lines, telephone and telegraph lines, utility installations, power lines, poles, tanks, machinery, equipment, buildings, electric power plants and equipment for generation and transmission of steam power and electric power and all structures and facilities relating thereto, which Lessee may desire to erect, construct or install in carrying on its business and operations on or from said land or with respect to the steam power or electric power developed thereon, and Lessee shall have the further right for itself, its subsidiaries or permittees, to erect, maintain, operate and remove a plant or plants, structures and facilities with all necessary appurtenances for the conversion of steam to electric power and for extraction of by-products from steam produced from said land and/or premises in the vicinity of said land, including all rights necessary or convenient thereto, together with rights-of-way for passage over, upon and across and ingress and egress to and from said land for any or all of the above mentioned purposes.

*Id.* at 2.  The Lease then describes the scope of GDP's remaining rights concerning the Property:

> The possession by Lessee of said land shall be sole and exclusive for the purposes hereof and for purposes incident or related thereto, excepting only that Lessor reserves the right to use and occupy said land, or to lease or otherwise deal with the same, for residential, agricultural, commercial, horticultural or grazing uses, or for mining of minerals lying on the surface of or in vein deposits on or in said land, which uses shall be carried on subject to and with as little interference as is reasonably possible with the rights and operations of Lessee hereunder.

*Id.*

In 1956, the Lease was amended; this amendment included language relevant to the

parties' use of the Property:

> Notwithstanding anything to the contrary contained in the granting clauses of the Lease [], it is now specifically agreed that Lessee's uses of the land covered by the Lease permitted by its terms shall prevail over any of the uses reserved by Lessor, and that said uses permitted to Lessee may interrupt any time and from time to time any of said reserved uses. Should any such uses by Lessee require or result in the destruction of or damage to productive trees, growing crops, or residential or other improvements owned by Lessor or others, Lessee shall pay to the owner or owners thereof the reasonable value of the property so destroyed or damaged."

Ex. C to Compl. at 2-3 (Dkt. No. 1-3).

Over the course of the Lease, Magma, Thermal Power Company, and Unocal have each been lessees, but Geysers Power has acquired all rights under the Lease as sole lessee. Sanchez-Elia Decl. ¶ 7. Geysers Power has drilled 60 steam extraction wells and 12 injection wells on the Property. Declaration of Kevin Talkington ISO Geysers Power's Motion for Summary Judgment or in the Alternative Summary Adjudication of Issues ("Talkington Oppo. Decl.") ¶ 11 (Dkt. No. 30). It also operates three power plants on the Property, where all the steam from the Property is "fed" once extracted. *Id.* ¶ 12. In addition to the lease that it has for the Property, Geysers Power also has 105 leases with neighboring landowners and 76 surface and sub-surface agreements for mineral rights and related rights-of-way. *Id.* ¶ 9. Geysers Power has drilled and maintained over 400 wells to extract steam from the subterranean geothermal field on land outside of the Property. *Id.*

During the term of the Lease, several easements for construction of power lines and electrical facilities on the Property have been granted to Pacific Gas & Electric ("PG&E").[1] GDP has placed nine easements granted to PG&E by GDP for access to the Property in the record. Sanchez-Elía Decl. ¶9, Exs. A-F (Dkt. No. 20); GDP RJN (Dkt. No. 28), Exs. A-F. One easement was issued to "construct electrical transmission facilities and power lines for the benefit of Occidental Geothermal, Inc., a competitor of [Geysers Power], who was extracting stream and converting it to power on land not owned by GDP." Sanchez-Elía Decl. ¶9; Ex. A. GDP states

---

[1] PG&E does not presently generate electricity in The Geysers; it instead purchases electricity from power generators in The Geysers and operates the transmission lines and infrastructure that carries the power it purchases. Talkington Oppo. Decl. ¶ 19.

that it did not seek agreement to or approval from Geysers Power before entering into these easements. GDP Oppo. at 12-13 (Dkt. No. 26).

For its part, Geysers Power offers six different consent agreements between it (or its predecessors-in-interest) and PG&E, allowing PG&E access to the Property. Geysers Power Request for Judicial Notice (RJN, Dkt. No. 23), Attachments 2-7. GDP responds that it was not a party to these "consents" and that there is no evidence from its files that GDP was made aware of them. Declaration of Sanchez-Elía ISO Plaintiff's Reply To Opposition to Motion for Summary Judgment ("Sanchez-Elía Reply Decl.") ¶ 3 (Dkt. No. 34).[2]

In 2017, Western GeoPower, Inc. ("WGP"), a subsidiary of U.S. Geothermal, Inc., approached GDP with a request for an easement to install power lines over a portion of the Property. Sanchez-Elía Decl. ¶10. WGP intends to extract steam and produce geothermal energy from a neighboring property on a site where there was a previously existing power plant, and transmit the electricity through power lines to an existing PG&E facility on the Property. *Id.*; Sanchez-Elía Reply Decl. ¶ 4. WGP does not need the proposed easement, but has identified the easement as the most cost-effective way to conduct business. *See* Declaration of Daniel W. Ballesteros ISO Geysers Power's Opposition to Motion for Summary Judgment ("Ballesteros Oppo. Decl."), Ex. B, at 2 (Dkt. No. 31); Sanchez-Elía Reply Decl. ¶ 4. GDP has not entered into an agreement with WGP. Sanchez-Elía Reply Decl. ¶ 4.

Geysers Power contends that WGP's extraction plans would adversely affect Geysers Power's revenue from the Property because the volume of the steam extracted on the Property would likely decrease as a result. *See* Talkington Decl. ¶ 15. The WGP proposal anticipates that the easement would result in potential steam decline at the Property because WGP, though drawing steam from a different property, would be drawing steam from the same geothermal field as Geysers Power. Ballesteros Decl., Ex. B, at 2 (recognizing that the contemplated easement fee paid by WGP to GDP would be intended in part to "offset the potential steam decline that could

---

[2] GDP also points out that at least two of the consents do not appear to concern access for electrical transmission, but for abatement of hydrogen sulfide, a toxic by-product of harvesting geothermal steam. *Id.* ¶ 3.

result from redevelopment of WGP's thermal resource"). The WGP proposal also recognizes that generating additional power from its site may decrease the sale price for electricity and, therefore, reduce GDP's profits for electricity generated on the Property. *Id.* (proposing to offset GDP's potential, future royalty reduction if more steam power production results in a decline in prices).

As of two years ago, Geysers Power was not drilling for steam on the parcel that would encompass the proposed WGP easement, nor were there any Geysers Power facilities that would be affected by the issuance of the easement sought by WGP. Declaration of Diego Sanchez-Elia ISO Plaintiff's Opposition to Defendant's Motion for Summary Judgment/ Adjudication ("Sanchez-Elia Oppo. Decl.") ¶ 8 (Dkt. No. 27). Geysers Power also has not communicated any intention to start operations on the relevant parcel. *Id.* When GDP informed Geysers Power about the WGP request, Geysers Power contended the terms of the Lease did not allow GDP to grant such easement without Geysers Power's consent. *Id.*

Given the parties' divergent view of the Lease, GDP brought this declaratory action. Dkt. No. 1. Specifically, GDP seeks a declaration of the GDP's rights under the Lease:

> (a) that under the Lease, [GDP] has the right to grant an easement or other permission on the Property, and in particular on Parcel APN 117-150-021, to a third-party for the installation, maintenance, and/or use of power transmission lines and facilities for the purpose of transmitting electric power derived from steam that was not extracted from the Property; and
>
> (b) that [Geysers Power] Defendants do not have a right under the Lease to grant an easement or other permission on the Property to a third-party for the installation, maintenance, and/or use of power transmission lines and facilities to transmit electric power derived from steam that was not extracted from the Property.

Compl. ¶ 14.

Each party now moves for summary judgment on the single cause of action, seeking a declaration regarding the proper scope of each party's access to and use of the Property pursuant to the terms of the Lease and the 1956 amendment.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

## I.    THE EXPRESS LANGUAGE OF LEASE

The parties disagree about the scope of their respective rights under the Lease and the 1956 amendment. GDP contends that it "retains all of its rights as a property owner except for those things which relate to geothermal extraction ***from the Property*** or would unreasonably interfere with [Geysers Power's] operations regarding geothermal extraction." GDP Mot. at 11-12 (Dkt. No. 18) (emphasis in original). In GDP's view, it is allowed to grant easements to third parties so long as it does not interfere with Geysers Power's ability to extract steam from the Property and generate power therefrom.

Geysers Power does not agree. In its view, the "plain and ordinary meaning of the language of in the lease do not reserve to [GDP] the right to grant an easement to a third-party to construct, maintain, and/or use power transmission lines and facilities for the purpose of transmitting electric power produced from steam not extracted from the [Property]." Geysers Power Mot. at 9 (Dkt. No. 22). Instead, Geysers Power believes that the language of the Lease

United States District Court
Northern District of California

and Agreement and the 1955 Amendment grants it "'sole and exclusive right' to install and maintain electricity transmission lines on the [Property]," meaning that GDP must receive that consent of Geysers Power before granting the easement at issue in this action. *Id*.

Under California law, contract interpretation is a question of law for the court's determination. *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965). "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003). Such intent should be inferred, if possible, from the written provisions of the contract. *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990). In interpreting a particular provision, a court must give terms their "ordinary and popular sense." *Id*. A contract provision is considered ambiguous when the provision is susceptible to more than one reasonable interpretation. *MacKinnon*, 31 Cal. 4th at 648. However, the "mere fact that a word or phrase in a [contract] may have multiple meanings does not create an ambiguity." *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1118 (1999).

The conflict between the parties' positions centers on what rights were granted to Geysers Power and what rights remain with GDP. The relevant portion of the Lease reads as follows:

> Lessor has granted, leased, let and demised and by these presents does grant, lease, let and demise to Lessee, its grantees, successors and assigns, upon and subject to the terms and conditions hereinafter set forth, the land and promises hereinafter described, with the sole and exclusive right to Lessee to drill for, produce, extract, take, remove and sell steam and steam power (and water without cost for Lessee's operations) from, and to store, utilize, process, convert, and otherwise treat with such steam and steam power upon, said land, during the term hereof with the right of entry thereon at all times for said purposes, and to construct, use, maintain, erect, repair and replace thereon and to remove therefrom all roads, pipe lines, telephone and telegraph lines, utility installations, power lines, poles, tanks, machinery, equipment, buildings, electric power plants and equipment for generation and transmission of steam power and electric power and all structures and facilities relating thereto, which Lessee may desire to erect, construct or install in carrying on its business and operations on or from said land or with respect to the steam power or electric power developed thereon.

Lease at 1-2.

Geysers Power argues against GDP's interpretation (giving GDP the unfettered right to

grant an easement allowing for construction of electrical transmissions lines across the Property to third parties) on four grounds: (1) the stated purpose of the Lease would be undercut by allowing that type of easement; (2) the Lease grants it "sole and exclusive" rights for transmission lines; (3) the 1956 amendment affirms that its rights are superior to those of GDP; and (4) the Lease does not reserve to GDP a right to grant easements to third parties to install and/or maintain electrical transmission lines on the Property. I address each ground in turn.

### A. Stated Purpose of the Lease

Geysers Power argues that the stated purpose of the lease is to "enable the development of 'natural steam' from the geothermal field and for 'mutual profit of the parties.'" Geysers Power Mot. at 9. In Geysers Power's view, allowing GDP to issue an easement to a third-party competitor would contradict the purpose and intent of the Lease because that competition could reduce the profits under the Lease. But Geysers Power does not accurately quote the purpose of the Lease. It is not to "enable the development of 'natural steam' from the geothermal field *and* for 'mutual profit of the parties.'" Geysers Power Mot. at 9. Instead, the stated purpose is to develop the Property which was suited "for development of natural steam and steam power" to "enable the development of said natural steam . . . for the mutual profit of the parties." Lease at 1. Despite Geysers Power's assertion, mutual profit is not an independent purpose of the lease but rather a consequence of the primary purpose, which is to "enable the development of 'natural steam'" on the Property. *See id*. Nothing in the record suggests that allowing GDP to sell an easement of access for power lines to a competitor hinders the ability of Geysers Power to develop the steam and steam power from the Property for the mutual profit of the parties. The contemplated WGP easement would merely allow transmission of electricity generated from steam extracted from other properties across the Property.

Geysers Power also contends that the issuance of the type of easement at issue in this action would result in a decrease in the amount of steam that could be extracted from the Property and a reduced price for electricity generated on the Property, decreasing the profit for both parties under the Lease. In Geysers Power's view, facilitating such decreases contradicts the purpose and intent of the lease. Geysers Power Mot. at 10. But this argument ignores the context of the

8

primary purpose of the Lease: the development of natural steam, a geothermal resource. Under California law, geothermal resources are considered mineral resources, meaning that the Lease is effectively a mineral lease. *Phillips Petroleum Co. v. County of Lake*, 15 Cal. App. 4th 180, 185 (1993). "It is said that the lessee [in a mineral lease] does not have the exclusive right to possession and enjoyment of the property. Rather, it has the right to extract minerals from the property and to reduce them to personal property. All other rights in the land, including surface uses, are retained by the landowner." *Id.* The language the Lease must be considered in this context.

Although the Lease was entered into as a means of mutual profit, no language in the agreement indicates that the parties intended that Geysers Power would be granted rights outside of those found in a typical mineral lease. This means that under the Lease Geysers Power could extract and benefit from the steam extracted from the Property, and under the express terms of the Lease have surface rights necessary to extract and convert *that* steam. But GDP retained the remaining surface uses of the Property. Those remaining rights include the granting of access rights such as easements to allow others to transmit electricity generated on other property across the Property. To find otherwise would be contrary to the fundamental understanding of a mineral lease.

Geysers Power's arguments concerning the purpose of the Lease are without merit.

**B.  Geysers Power's "Sole and Exclusive" Rights**

Geysers Power argues that pursuant to language in the Lease, its rights regarding the activities listed are "sole and exclusive," meaning that it may exclude all other entities from carrying out these same activities on the Property. It contends that one such exclusive activity is the right to install and maintain electricity transmission lines over the Property. But the Lease language does not support this reading; Geysers Power's rights are not as broad as it contends.

Two limitations narrow the scope of Geysers Power's "sole and exclusive" rights. First, the "sole and exclusive" rights identified are consistently limited to the steam and steam power activities (production, transmission, utilization, etc.) arising from "the land" and upon "said land." Lease at 1-2. The sole and exclusive rights, therefore, are inexorably tied to activities that Geysers

9

Power conducts upon the Property.

Second, while the lessee is given the right to construct and maintain equipment for the transmission of power, that right is limited to the purpose of "carrying on its business and operations on or from said land or with respect to the steam power or electric power developed thereon." *Id*. at 2. So while the lessee has sole and exclusive rights to install and maintain electricity transmission lines for steam and steam power generated from the Property, the lessee does not have sole and exclusive rights to install and maintain transmission lines for steam and steam power generated outside of the Property. *See also id*. at 2 ("The possession by Lessee of said land shall be sole and exclusive for the purposes hereof and for purposes incident or related thereto, excepting" the rights reserved to the lessor.).

Geysers Power puts much emphasis on the following language from the Lease: "Lessee shall have the further right for itself, its subsidiaries or permittees, to erect, maintain, operate and remove a plant or plants, structures and facilities with all necessary appurtenances for the conversion of steam to electric power and for extraction of by-products from steam **produced from said laid and/or premises in the vicinity of said land**. . . ." Lease at 2 (emphasis added). Geysers Power argues that given the fact that the geothermal field extended beyond the borders of the Property, this provision shows that the parties contemplated that Geysers Power's exclusive rights extended to all steam and steam power flowing through the Property, not just those extracted from the Property.

I disagree. The language that Geysers Power relies on specifically references by-products of steam. Geysers Power's interpretation seeks to apply the phrase "produced from said land and/or premises in the vicinity of said land" to both by-product extraction and steam conversion. But the most natural reading of the Lease demonstrates that GDP granted Geysers Power the exclusive right to extract steam by-products that originated on the Property as well as that which flowed into the Property—not exclusive rights with respect to steam converted to electric power elsewhere in the geothermal field. As discussed more below, nothing in the language of the Lease gives Geysers Power the right to preclude GDP or a third party from building transmission lines across the Property to transport electricity generated outside of the Property, as long as those

activities do not interfere with Geysers Power's own activities.

GDP seeks a declaration that it has the sole right to issue easements that allow third parties to transmit steam-generated electricity from land not within the Property to an existing PG&E facility on Plaintiff's property. Geysers Power's "sole and exclusive" rights are not violated by that type of easement because its rights must be related to the steam power or electricity developed on the Property. Given this, Geysers Power's "sole and exclusive" rights do not prevent GDP from granting a third party an easement for transmission lines.

### C.    The 1956 Amendment

Geysers Power contends that the 1956 amendment establishes that its rights are superior to the rights of GDP, bolstering its argument that GDP needs Geysers Power's consent before granting a third party a transmissions line easement. Specifically, Geysers Power points to language that its "uses of the land covered by the Lease permitted by its terms shall prevail over any of the uses reserved by [GDP], and that said uses permitted to [Geysers Power] may interrupt any time and from time to time any of said reserved uses." Ex. C to Compl. at 2. However, the 1956 amendment grants Geysers Power "superior" rights only for the rights enumerated in the Lease. And Geysers Power's rights are limited to those enumerated to the extent they aid in Geysers Power "carrying on its business and operations on or from [the Property] or with respect to the steam power or electric power developed thereon." Lease at 2.

Although the 1956 amendment means that Geysers Power's operational and business uses can result in interruption or destruction of GDP's uses of the Property, those "superior" rights only become relevant where an actual conflict exists between Geysers Power's and GDP's uses. Where GDP's uses of the Property do not conflict with Geysers Power's operational and business use, the 1956 amendment does not come into play. Geysers Power has failed to identify any evidence in the record that suggests that the contemplated easement would result in a conflict implicating the 1956 amendment. It cannot rely on the 1956 amendment to prevent GDP from issuing an easement to a third party.

### D.    GDP's Reserved Rights

The Lease also specifically enumerates GDP's reserved rights. GDP "reserves the right to

use and occupy said land, or to lease or otherwise deal with the same, for residential, agricultural, commercial, horticultural or grazing uses, or for mining of minerals lying on the surface of or in vein deposits on or in said land, which uses shall be carried on subject to and with as little interference as is reasonably possible with the rights and operations of [Geysers Power] hereunder." Lease at 2. Geysers Power argues that the reservation of rights for "commercial" purposes does not encompass GDP granting a third party an easement that allows it to compete with Geysers Power. But nothing in the express language of the Lease or in its purpose prevents GDP from allowing commercial use of the Property so long as that use does not interfere with Geysers Power's use, which as noted above there is no evidence of. Accordingly, so long as the easement does not interfere with the operations of Geysers Power on the Property, GDP can issue the easement.

The express language of the Lease demonstrates that GDP reserved its commercial rights-- that includes granting an easement to a third party for transmission lines so long as the easement does not interfere with Geysers Power's ability to conduct its operations on the Property.[3]

## II.    IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

As a fall back argument, Geysers Power contends that even if the easement at issue would not violate the express terms of the Lease or the 1956 amendment, it nonetheless violates the covenant of good faith and fair dealing implied in the parties' contracts. "The covenant of good faith and fair dealing, implied by law in every contract, exists to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement." *SocialApps, LLC v. Zynga, Inc.*, No. 11-cv-4910-YGR, 2012 WL 381216, at *4 (N.D. Cal. Feb. 6, 2012). "[A]n implied covenant of good faith and fair dealing cannot contradict the express terms of a contract." *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 55 (2002).

---

[3] GDP also seeks a declaration that Geysers Power does not have rights to grant easements to third parties for the installation, maintenance, and/or use of power transmission lines and facilities to transmit electric power derived from steam that was not extracted from the Property. GDP Mot. at 13; Compl. ¶ 14. Geysers Power fails to address this request or GDP's argument in favor of it in its opposition to GDP's motion. Given the interpretation of the Lease discussed above, GDP is likewise entitled to a declaration that the Lease does not allow Geysers Power the right to grant such easements.

The implied covenant is violated, according to Geysers Power, because granting the easement could reduce Geysers Power's profits from its "sole and exclusive" rights to develop, transmit, and sell steam-generated electricity on the Property, reducing Geysers Power's benefit from the Lease. As noted above, Geysers Power identifies two ways this could happen. First, by giving WGP the contemplated easement, GDP would facilitate WGP's redevelopment of its power plant and that could reduce the amount of steam that Geysers Power could extract from the Property. Talkington Decl.¶ 15. Second, by facilitating WGP's extraction and conversion of steam and the transmission of power produced, the increase in power produced could result in decreased prices and profit from electricity generated on the Property. *See* Ballesteros Decl., Ex. B, at 2.

Geysers Power relies on *In re Vylene Enterprises, Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996), where the Ninth Circuit affirmed the bankruptcy court's finding that a franchiser breached the covenant of good faith and fair dealing where it constructed a competing restaurant within a mile and a half of its existing franchisee, even though the franchisee did not have any "exclusive territory" rights under the franchise agreement. The court held that the franchisee was entitled to expect that the franchisor would "not act to destroy the right of the franchisee to enjoy the fruits of the contract." *Id.* Geysers Power contends that the instant case is similar and that it is entitled to an expectation that GDP will do nothing to decrease the fruits of the Lease, namely issue an easement that could result in the reduction of Geysers Power's revenue.

*In re Vylene Enterprises* is inapposite. The contract in *In re Vylene Enterprises* was a franchiser-franchisee agreement, meaning that the context of the relationship and expectations between the relevant parties are substantially different and the nature of the rights conveyed are likewise substantially different, given that this case centers on a mineral rights lease. *See id.* Further, the circumstances are different. In *In re Vylene Enterprises*, the franchiser undertook the actions that led to the harm suffered by the franchisee itself (the construction of a competing restaurant). *Id.* Here, GDP is not the party that will cause the possible decrease in Geysers Power's revenue: that decrease will only potentially result from WGP's refurbishment of the power plant on the neighboring property. WGP does not need the easement from GDP in order to

operate its refurbished plant; it could opt to use less efficient means to transmit the electricity it generates. *See* Ballesteros Decl., Ex. B, at 1-2 (noting that easement represents most cost efficient option but that WGP could proceed with alternative that would still result in decline in GDP's revenue). GDP merely seeks to benefit from actions taken by a third party on other property that may cause the decline in Geysers Power's revenues. As GDP points out, whether a third party drills for steam at The Geysers outside of the Property is not something that it can control. *In re Vylene Enterprises*, where the damage to plaintiff was caused by the franchisor, is simply not instructive.

In addition, Geysers Power by its own admission routinely extracts steam from other properties in The Geysers, meaning that it is guilty of the same actions that it contends constitute bad faith here—actions that result in a potential decrease of revenue from steam extraction on the Property. Talkington Oppo. Decl. ¶ 9. Given this admission, I find that the issuance of the type of easement described in GDP's declaratory claim to a third-party would not be "bad faith" in the context of the Lease.

Geysers Power also argues that even if its rights are not as exclusive and broad as it contends, it has "a reasonable expectation based on the lease, that [GDP] will not enter into contracts that destroy or diminish the fruits of the lease" as required by the covenant of good faith and fair dealing. Geysers Power Mot. at 17. Geysers Power's rights in the Lease are discussed above, as are GDP's reserved rights. One of GDP's reserved rights is the ability to use the Property for commercial purposes so long as it does not interfere with the operations of Geysers Power on the Property. Geysers Power has failed to demonstrate that the issuance of the easement at issue would interfere with its uses of the Property; preventing GDP from issuing easements of the type at issue would contradict the express term of the Lease preserving GDP's ability to use the Property for non-conflicting commercial purposes. The implied covenant of good faith and dealing cannot be used to do that. *See Storek & Storek*, 100 Cal. App. 4th at 55.

## III. COURSE OF DEALING

Geysers Power also argues that the course of dealing between the parties with respect to prior third-party easements and agreements establishes that the parties understood the terms to

14

require Geysers Power's consent for the issuance of any rights for transmission wires on the Property. Geysers Power's Mot. at 14. Under California law, the terms of a written contract "may be explained or supplemented by course of dealing or . . . by course of performance." Cal. Code of Civ. Proc. § 1856(c). "Course of dealing" is defined as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *In re CFLC, Inc.*, 166 F.3d 1012, 1017 (9th Cir. 1999) (citation and quotation marks omitted). Course of dealing evidence "may supplement" a contract "by providing evidence of the parties' intentions." *Id*. "An inference of the parties' common knowledge or understanding that is based upon a prior course of dealing is a question of fact." *Id*. (citation omitted).

GDP objects to consideration of this extrinsic evidence because, as noted above, the express terms of the parties' agreements are clear and support its argument. I agree that consideration of this extrinsic evidence is unnecessary. *See Georgia-Pac. v. Officemax Inc.*, No. 12-CV-02797-WHO, 2013 WL 5273007, at *6 (N.D. Cal. Sept. 18, 2013) ("The mutual intention of the contracting parties at the time the contract was formed governs, and that intention must be ascertained solely from the written contract if possible. . . ." (internal quotations omitted)). Even if considered, this evidence further supports GDP's position.

Geysers Power relies on evidence that from 1960 through 1979, there were at least six recorded consents where Geysers Power's predecessors expressly consented to PG&E's acquisition of grants of easements and right of ways on the Property. *See* Request for Judicial Notice, Attachments 2-7 (Dkt. No. 23:2-7). Although GDP was not an express party to these consents, the language of the consents clearly pertain to the Property and generally suggest that GDP, or its predecessor, may have entered into separate agreements with PG&E. *Id.* At least one of the consents expressly refers to the execution by GDP of a modification to a prior easement, presumably entered into between GDP and PG&E. *Id.*, Attachment 6. While GDP disputes the relevance and provenance of these consents, GDP does not submit evidence to refute Geyser Power's claim that the consents apply to easements that were issued by GDP or its predecessors. *See* GDP Oppo. at 9. Geysers Power contends that "[b]ecause of the timing and reoccurrence of

the consents, the pattern of [Geysers Power's] granting permission should be given substantial weight for purposes of construing the meaning of the lease." Geysers Power Mot. at 14. In Geysers Power's view, these consents demonstrate that the Lease, along with the 1956 amendment, intended that GDP receive its consent before issuing the type of easements at issue in this declaratory relief action to third parties.

I disagree. Geysers Power attempts to use only six consent agreements, the last of which was entered into 30 years ago, to establish a course of dealing. However, GDP points to nine easements that GDP granted to allow for construction and maintenance of power lines and transmission facilities on the Property. GDP contends that these were secured and entered into without Geysers Power's apparent consent, and points out that one of the easements was provided to PG&E to benefit Occidental, a competitor of Geysers Power. *See* Sanchez-Elía Decl. ¶9, Ex. A-F; *see also* GDP RJN (Dkt. No. 28), Exs. A-F (easements from 1965 through 1983).

Geysers Power suggests that the nine easements cannot be considered relevant to this action because they do not identify the source of the power to be transmitted. Geysers Power Oppo. at 13-14. In Geysers Power's view, these easements only demonstrate that GDP has granted PG&E the ability to construct and maintain electricity transmission lines over the Property, not granted transmission easements for electrical power generated from steam located outside the Property, which Geysers Power contends would be a broader right. *Id.* But GDP has shown, at a minimum, that one of the easements – the one to benefit Geysers Power's former competitor Occidental – was to allow construction of power lines carrying power from the Occidental plant and connecting to power lines on the Property. Sanchez-Elía Reply Decl. ¶¶ 5-7.[4] Further, Geysers Power fails to identify evidence that its consent was sought or secured for the GDP-relied on easements.

---

[4] In addition, Geysers Power's assertion that the PG&E easements relied on by GDP may not concern transmission of power generated outside the Property is undermined by its own evidence. Geysers Power's declarant explains that between the 1960s and 1990s, PG&E operated its own power plants on other properties in The Geysers and would transmit the energy via its own "infrastructure" including transmission lines it owned and operated. Talkington Decl. ¶¶ 16-17. Geysers Power does not identify any power plant owned by PG&E operating on the Property. The only reasonable inference is that the transmission line easements identified by GDP allowed PG&E to transport power generated at power plants not on the Property across the Property.

Taken together, the easements (some of which were consented to and others which were not) and consents do not establish that the terms of the Lease and the 1956 amendment contemplate that GDP would need to seek Geysers Power's permission to grant easements to third parties for transmission lines or related facilities. The record shows, at most, an inconsistent course of dealing between the parties. As a result, course of dealing does not support Geysers Power's position as to how the Lease should be interpreted.

In sum, the plain language of the Lease and the 1956 amendment demonstrate that GDP's reserved rights encompass an ability to grant the type of easement at issue. Geysers Power has not demonstrated that such an easement will interfere with its operations on the Property as contemplated by the Lease. Geysers Power has likewise not shown that it retains any power to issue a right or easement on the Property to a third-party for the installation, maintenance, and/or use of power transmission lines and facilities to transmit electric power derived from steam that was *not* extracted from the Property.

## CONCLUSION

For the reasons discussed above, I GRANT GDP's motion for summary judgment and DENY Geysers Power's motion. Under the Lease and further agreements between the parties:

(a) GDP has the right to grant an easement or other permission on the Property, and in particular on Parcel APN 117-150-021, to a third-party for the installation, maintenance, and/or use of power transmission lines and facilities for the purpose of transmitting electric power derived from steam that was not extracted from the Property; and

(b) Geysers Power does not have a right under the Lease to grant an easement or other permission on the Property to a third party for the installation, maintenance, and/or use of power transmission lines and facilities to transmit electric power derived from steam that was not

extracted from the Property.

Judgment shall be entered in accordance with this Order.

**IT IS SO ORDERED.**

Dated: August 6, 2018



William H. Orrick
United States District Judge